IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **KELSEY-SEYBOLD MEDICAL GROUP,** § <br> **P.A. D/B/A KELSEY-SEYBOLD CLINIC,** § <br>     **Plaintiff** § <br> § **CIVIL ACTION No. 4:07-CV-00640** <br> **vs.** § **JURY DEMANDED** <br> § <br> **GREAT-WEST HEALTHCARE OF** § <br> **TEXAS, INC.,** § <br>     **Defendant** § | |

**PLAINTIFF KELSEY-SEYBOLD MEDICAL GROUP, P.A.'S
MOTION FOR SUMMARY JUDGMENT
TO CONSTRUE THE PARTIES' CONTRACTS**

Plaintiff Kelsey Seybold Medical Group, P.A. d/b/a Kelsey-Seybold Clinic ("Kelsey") files this Motion for Summary Judgment to Construe the Parties' Contracts.

**I. INTRODUCTION**

Kelsey is asking this Court to rule that Great-West Healthcare of Texas, Inc. ("Great-West") has to pay Kelsey at a discount off Kelsey's billed charges. It is also asking this Court to determine that Great-West's obligation to pay a discount off billed charges continues from December 31, 2002 through today.

**II. FACTUAL BACKGROUND**

In 1996, Kelsey and Great-West agreed that Kelsey would provide medical services to third parties in exchange for payment.[1] In the original contracts, Kelsey was not paid based upon the charges that it billed for its services. Instead, it was paid based upon a fee schedule that the parties attached to the contracts as an exhibit, which was a chart that listed the fees Great-West

---

[1] Great-West previously conducted business in the state of Texas as One Health Plan of Texas, Inc. In July 2003, One Health Plan of Texas, Inc. amended its articles of incorporation and changed its name to Great-West Healthcare of Texas, Inc.

was to pay Kelsey for individual services identified by their current procedural terminology codes ("CPT codes"). (Ex. 2 at KS 00023-KS00028; Ex. 3 at KS 00066-KS 00071 and Ex. 4. at KS 00105 – KS00112.)

In September 2000, the parties amended the contracts to increase payments to Kelsey and to base payment upon Kelsey's billed charges. (*See* Ex. 5, and 21–23.) No other contractual provisions or exhibits were amended. (*See* id.) The amendments replaced the chart of contracted rates with the following payment terms:

<u>All Products – same fee schedule</u>

| | |
|---|---|
| October 1, 2000 through December 31, 2000 | 23% Discount off billed charges |
| January 1, 2001 through December 31, 2001 | 17% Discount off billed charges |
| January 1, 2002 through December 31, 2002 | 14% Discount off billed charges |

(Ex. 21–23.)

Prior to signing the amendments, the parties negotiated for five months about their terms. Starting in April 2000, Kelsey requested that Great-West increase its payments to Kelsey. (Ex. 5.) In a letter dated April 24, 2000, Marnie Matheny, Kelsey's Vice-President of Contracting and Payor Relations, informed Great-West that its payment rates were much lower (20 to 30 percent) than its competitors in the Houston market. (Ex. 5. and *see* Ex. 8.) She then informed Great-West that Kelsey would terminate the contracts unless Great-West agreed to renegotiate so that Kelsey would be paid based upon a discount from Kelsey's billed charges. (Id.; Ex. 36, Dep. of Marnie Matheny at p. 38.)

Throughout the next several months, the parties negotiated about the payments that Kelsey would receive under the contracts, but Kelsey never wavered from its position that its payments would have to be based upon its billed charges. Kelsey first proposed that Great-West

2

pay Kelsey "12% discount off of billed charges for the PPO and POS Agreements and a 14% discount for the HMO product." (Ex. 5 and *see* Ex. 38 Dep. of Marnie Matheny at p. 36.) In response, Great-West proposed that the discount rate off of Kelsey's billed charges be phased in incrementally over several years. (Ex. 8.) Great-West also requested "a list of KS billed charges for," (Ex. 8), numerous procedures it deemed representative in order to have "a very accurate idea of what that proposal was looking like," specifically "what a 12 percent discount and a 14 percent discount was . . . ."[2] (Ex. 38, Dep. of Chad Matteson at p. 25-26.) Throughout the negotiations, Great-West understood that the parties were negotiating discounts off of Kelsey's billed charges. (Ex. 37, Dep. of Chris Knackstedt at p. 62.)

From July 19, 2000 through the end of September, the parties negotiated the percentage discount to be incrementally applied to Kelsey's billed charges. (Ex. 12-16; Ex. 36, Dep. of Marnie Matheny at p. 49-52; Ex. 37, Dep. of Chris Knackstedt p. 58, 62; Ex. 38, Dep. of Chad Matteson at p. 37-38.)

In September 2000, Great-West drafted the amendments, cutting and pasting from the previous exhibits to the previous contracts. (*See* Ex. 38, Dep. of Chad Matteson at pp. 165-66.) The parties ultimately agreed that the percentage discount to be applied to Kelsey's billed charges would decrease from 23% to 17% and then 14% from 2000 through the end of 2002. (Id. and Ex. 21-23.)

After Kelsey provided medical services to patients with Great-West coverage, it submitted bills to Great-West for payment. Each bill included Kelsey's charge for each service identified by CPT code. (Ex. 38, Dep. of Marnie Matheny at p. 44 and 74.) However, Great-

---

[2] In addition to providing its billed charges in 2000 for a select number of procedures as Great-West requested, Kelsey also provided Great-West with a list of its billed charge in 2000 for the procedures it offered as of August 2000. (Ex. 17, Dep. of Marnie Matheny at pp. 54-56.)

West failed to pay Kelsey the contracted rates for its medical services, and Kelsey sued Great-West to obtain contract damages and penalties. (*See* Pl.'s Pet. at ¶¶ 1-28.) It now requests that this Court grant it summary judgment to construe the contracts according to their clear language.

### III. UNDISPUTED FACTS

The following facts are undisputed:

1. The parties entered into three contracts covering the Great-West's PPO, POS, and HMO products. (Ex. 2-4.)

2. The parties amended the payment terms of their contracts in 2000; at that time, no other contract provisions were amended. (Ex. 21-23; Ex. 37, Dep. of Chris Knackstedt at p. 101; Ex. 38, Dep. of Chad Matteson at pp. 159, 165-66.)

3. The contracts automatically renew for successive 12-month terms unless terminated. (Ex. 2 at pp. KS 00008 & KS 00035; Ex. 3 at p. KS 00049; Ex. 4 at pp. KS 00093 & 00115; Ex. 36, Dep. of Marnie Matheny at p. 32; Ex. 37, Dep. of Chris Knackstedt at pp. 30-32.)

4. When the contracts renew, the last agreed payment rates apply. (Ex. 36, Dep. of Marnie Matheny at pp. 79-80; Ex. 37, Dep. of Chris Knackstedt at pp. 31-32, 100-101.)

5. The parties did not renegotiate the payment rates in 2001-2007 and did not terminate the contracts. (Ex. 36, Dep. of Marnie Matheny at p.79-80; Ex. 37, Dep. of Chris Knackstedt at p. 100.)

### IV. ISSUE PRESENTED

Great-West acknowledges that it is required to pay Kelsey for the medical services Kelsey provides. The parties disagree on how much Great-West is obligated to pay Kelsey from October 1, 2000 through the present. To answer this question, the Court must examine the following provisions of the parties' agreements:

> ONE Health Plan of Texas, Inc.
> FIRST AMENDMENT
> To POS [PPO and HMO] Agreement
>     * * *

EXHIBIT III

4

\* \* \*

<u>All Products – same fee schedule</u>

| | |
|---|---|
| October 1, 2000 through December 31, 2000 | 23% Discount off billed charges |
| January 1, 2001 through December 31, 2001 | 17% Discount off billed charges |
| January 1, 2002 through December 31, 2002 | 14% Discount off billed charges |

(Ex. 23-25.) This provision unambiguously requires Great-West to pay Kelsey at 23%, 17%, and 14% off of the billed charges that Kelsey submitted to Great-West. Kelsey is for this Court to determine that "billed charges" means billed charges – or, the charges on the bill.

Kelsey is also asking this Court to interpret the provisions set forth in Sections 2 and 4 of the contracts as follows:

> 2.   <u>Term and Termination</u>. The initial term of this Agreement begins on the Effective Date of this Agreement and will continue in effect for a period of twelve (12) months. Thereafter, this Agreement will automatically be renewed for successive one (1) year terms until terminated as herein provided. . . .
>
> 4.   <u>Modification of Rates and Factors</u>. Company and Group acknowledge that the rates established in Section 3 Group Compensation shall be in effect for a period of twelve months from the effective date of this Agreement (Initial Compensation period). Thereafter, Company and Group agree that rates shall be renegotiated for each additional compensation period (Annual Compensation Period) and such renegotiated rates shall be reflected as an Amendment in this Agreement. The parties agree to enter into these negotiations no later than ninety (90) days prior to the end of any term of this Agreement. Parties agree that these negotiations shall be completed no later than thirty (30) days prior to the end of any term of this Agreement. Parties agree to meet and discuss rates in good faith and if no agreement can be reached, either party can elect to terminate this Agreement pursuant to section 2(f). **Otherwise, agreed upon compensation will become effective on the first day of the next term of this agreement.**[3]

---

[3] Section 4 set forth in parties' HMO agreement varies slightly from the language cited below. This difference, however, does not alter Kelsey's interpretation of the provision. Section 4 of the HMO agreement states:

5

(emphasis added)  (Ex. 2 at pp. KS 00008 & KS 00035; Ex. 3 at p. KS 00049; Ex. 4 at pp. KS 00093 & 00115.)  Because the parties agreed upon a 14% discount off billed charges as of December 31, 2002, Section 2 required Great-West to continue paying Kelsey at a 14% discount off of billed charges when the contracts automatically renewed.  (Id.)  Moreover, because the 14% discount off of Kelsey's billed charges was the last agreed upon compensation, it became "effective on the first day of the next term of" the agreements each year they were renewed. (Id. at KS 00035 and KS 00115.)

## V. Evidence

Kelsey identifies the following evidence which is either set forth in the Appendix attached and filed with this motion or included in the parties' Exhibit Notebook filed with the Court on January 11, 2008.  Kelsey incorporates by reference the evidence identified below into its motion.

| Exhibit No. | Description |
|---|---|
| 2 | One Health Plan of Texas, Inc. Kelsey-Seybold Medical Group, P.A. d/b/a Kelsey-Seybold Clinic POS Medical Group Agreement. |
| 3 | One Health Plan of Texas, Inc. Kelsey-Seybold Medical Group, P.A. d/b/a Kelsey-Seybold Clinic Medical Group Fee for Service Agreement. |
| 4 | One Health Plan of Texas, Inc. Kelsey-Seybold Medical Group, P.A. d/b/a Kelsey-Seybold Clinic PPO Medical Group Agreement. |
| 5 | Correspondence from Marnie P. Matheny to Chad Matteson dated April 24, 2000. |

---

Company may propose changes to rates or factors in Section 3 Group Compensation by giving written notice at least ninety (90) days prior to the end of any term of this Agreement.  If the proposed rates are unsatisfactory to Group, the parties agree to meet and discuss in good faith the proposed changes.  If no agreement can be reached, either party may elect to terminate this Agreement pursuant to Section 2(f).  Otherwise, the proposed rates will become effective on the first (1st) day of the next term of this Agreement.

(Ex. 3 at p. KS 00050-KS 00051.)

| Exhibit No. | Description |
|---|---|
| 8 | Email from Chad Matteson to Marnie Matheny dated May 25, 2000. |
| 12 | Correspondence from Marnie Matheny to Chad Matteson dated July 19, 2000. |
| 13 | Correspondence from Marnie Matheny to Chad Matteson dated July 19, 2000. |
| 14 | Email from Marnie Matheny to Chad Matteson dated July 25, 2000. |
| 15 | Email from Marnie Matheny to Chad Matteson dated July 25, 2000. |
| 21 | One Health Plan of Texas, Inc. First Amendment to POS Agreement – Exhibit III Fee Schedule. |
| 22 | One Health Plan of Texas, Inc. First Amendment to PPO Agreement – Exhibit III Fee Schedule. |
| 23 | One Health Plan of Texas, Inc. First Amendment to HMO Agreement – Exhibit IV Fee Schedule. |
| 31 | Correspondence from Janice Fagen to Spencer Berthelsen, M.D. dated May 24, 2006. |
| 33 | Correspondence from Robert Little to Nicholas Ro dated August 30, 2006. |
| 36 | Deposition Transcript of Marnie Matheny dated September 13, 2007. |
| 37 | Deposition Transcript of Chris Knackstedt dated September 14, 2007. |
| 38 | Deposition Transcript of Chad Matteson dated November 27, 2007. |
| 39 | Declaration of Marnie Matheny dated January 22, 2008. |
| 40 | Correspondence from Sean Gorman to Earnest Wotring dated June 22, 2007. |
| 41 | Contract Provisions Submitted by Kelsey to be Construed by this Court. |

## VI. ARGUMENT & AUTHORITIES

### A. Summary Judgment and Contract Interpretation Standard.

Summary judgment on a party's contractual obligations is proper when the pleadings, depositions, and documents, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Christopher Village, L.P. v. Retsinas,* 190 F.3d 310, 314 (5th Cir.1999). Under Texas law, "the interpretation of an unambiguous contract, as well as the determination of whether or

7

not a contract is ambiguous, is a legal question."[4] *Steuber Co. v. Hercules, Incorp.,* 646 F.2d 1093 1098 (5th Cir. 1981). A contract is not ambiguous if it can be given "a definite or certain meaning as a matter of law." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex. 1992). This Court has reasoned that "[a]n ambiguity in a contract only exists when a reasonable, fully-informed, disinterested person would be confused by the words used. This confusion occurs when the words in the contract are susceptible of more than one reasonable meaning." *Tetra Applied Technologies, LP v. Henry's Marine Service*, Cause No. H-04-2576, 2007 WL 1239240 at *3 (April 27, 2007) (J. Hughes) (breach of contract action in which maritime law applied). An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. "For an ambiguity to exist, both interpretations must be reasonable." *Columbia Gas,* 940 S.W.2d at 589 (internal citations omitted).

The party moving for summary judgment has the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact concerning the contract's plain and definite terms.[5] Courts should take the wording of the contract, "consider same in the light of the surrounding circumstances, and apply the pertinent rules of construction thereto and thus settle the meaning of the contract." *Richland Plantation Co. v. Justiss-Mears Oil Co., Inc.,* 671 F.2d 154, 156 (5th Cir. 1982) (citing *Harris v. Rowe,* 593 S.W.2d 303, 306 (Tex. 1979). In cases like this, where the contract language is clear and definite, courts must apply the plain language as a matter of law. *See DeWitt County Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex. 1999); *Gonzalez v. Denning,* 394 F.3d 388, 392 (5th Cir. 2004) (contract

---

[4] The substantive law of Texas applies because the contracts at issue were negotiated and signed in Texas and Kelsey only provides care in Texas. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938).

[5] The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. There must be an absence of any genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986).

8

language should be given its ordinary and generally accepted meaning unless the contract itself shows that the parties intended the terms to have a different, technical meaning) (internal citations omitted).

Courts should give effect to all the provisions of the contract so that none will be rendered meaningless. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Courts may not, however, rewrite an agreement between parties or make a new contract for the parties, but instead should hold the parties to their agreement as written. *See Yturria v. Kerr-McGee Oil & Gas Onshore, LP, Cause No.* 7:05-cv-181, 2006 WL 3227326 (S.D. Tex. Nov. 6, 2006) (J. Alvarez); *HECI Explor. Co. v. Neel*, 982 S.W.2d 881, 888-89 (Tex. 1998); *Border v. KRLB, Inc.*, 727 S.W.2d 357, 359 (Tex. App.—Amarillo 1987, writ ref'd n.r.e.).

### B. "Billed charges" means Kelsey's billed charges.

Kelsey is requesting a ruling that when the parties agreed that it would be paid a "discount off billed charges," the parties meant that Kelsey would be paid a discount off of the billed charges reflected on Kelsey's invoices. Kelsey's interpretation is consistent with the plain language of the amendments, the history surrounding the drafting and execution of the amendments, the ordinary and accepted meaning of the term "billed charges" as well as the use of that term in the industry.

The language of the amendments and the circumstances surrounding their execution support Kelsey's interpretation. The amendment language unequivocally provides that Kelsey is to be paid a 23%, 17% and 14% discount off billed charges. (Ex. 21-23) The parties understood that the negotiated percentage discounts were off of Kelsey's billed charges, not some other entities' billed charges. (Ex. 37, Dep. of Chris Knackstedt at p. 62 ("Q. And the parties understood, when they were negotiating, that the discounts were off of Kelsey's billed charges?

9

A. Yes.")  The amendments do not state that the parties are to reconvene and renegotiate payment rates in the future or that the amendment is simply an agreement to agree in the future as Great-West contends.  (Ex. 21-23; Ex. 38, Dep. of Chad Matteson at p. 180-81, 200-01.)

Kelsey's interpretation of the contract is consistent with well-known regulatory definition of "billed charges."  The Texas Department of Insurance's ("TDI") definition of "billed charges" and the Texas' Legislature understanding of these terms support Kelsey's interpretation.  The TDI defines "billed charges" as "[t]he charges for medical care or health care services included on a claim submitted by a physician or provider."  TEX. ADMIN. CODE § 21.2802.  TDI specifically defined this term to implement Texas' prompt pay laws.  *Id*. at § 21.2801.  Likewise, the penalty calculation provisions of the Texas' prompt pay laws state that "billed charges" are the charges "submitted on the claim."  TEX. INSUR. CODE §§ 843.342(a)(1), (b)(1) and §§ 1301.137 (a)(1) and (b)(1).

The term "billed charges" is commonly used in the healthcare industry and is generally understood and accepted to refer to or mean the charge for services included on a healthcare provider's claim for payment.  (Ex. 39, Aff. of Marnie Matheny at ¶¶ 4-6.)  Because its meaning is known and accepted throughout the industry, the term "billed charges" is often used in healthcare service contracts to describe the rates at which a provider will be paid.  (Id. at ¶ 6)  The term is so well accepted that after Kelsey informed Great-West of its substantial underpayments and Great-West's failure to pay the correct discount, Great-West proposed the parties enter into a Second Amendment to the contracts "to clarify their relationship moving forward."  (Ex. 31.)  In the proposed Second Amendment, the payment provision states that Kelsey would be compensated at a "14% discount off of Providers billed charges."  (Ex. 31.)

Whatever else Great-West felt needed to be clarified through the Second Amendment, it obviously did not feel that the term "billed charges" needed further explanation.

In determining the ordinary and generally accepted meaning of words, courts use the dictionary. *See Yturria,* 2006 WL 3227326 at * 7 (citing *City of Corpus Christi v. Bayfront Assoc., Ltd.*, 814 S.W.2d 98, 104 (Tex. App.—Corpus Christi, 1991, writ denied) ("The dictionary is the logical source for the plain, ordinary and generally accepted meaning of words"). The verb "bill" is defined as "a: to enter in an accounting system: prepare a bill of (charges) b: to submit a bill of charges to . . . ." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY, 150 (1987) (parenthesis in orig). The noun "charge" is defined as "a: EXPENSE, COST, b: the price demanded for something, c: a debit to an account, d: the record of a loan." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY, 227 (1987) (emphasis in orig). The dictionary definitions of these terms, when taken in the context of the parties' agreements, establish that the plain and generally accepted meaning of "billed charges" is the charges for services submitted on Kelsey's invoice or claim.

Analyzing the parties' contracts as a whole and applying the ordinary and plain meaning of "billed charges" leads to one conclusion: Great-West was obligated to pay progressively lower discount rates to the charges submitted on Kelsey's invoices.

**C.     Great-West's Interpretations of the Contract are Incorrect.**

The slipperiness with which Great-West treats the language of the amendments fails to provide a suitable foundation for construing them. To avoid the ramifications of interpreting "billed charges" as common sense demands, Great-West takes the position that the term "billed charges" is susceptible to different definitions within the same document, the same page and, nearly the same paragraph. Mr. Knackstedt agreed with Kelsey's position when he testified that

11

"billed charges" in the lead-in sentence describing the discounts[6] means the billed charges on Kelsey's invoice. (Ex. 37, Dep. of Chris Knackstedt at p. 119.) However, when the term "billed charges" appears in the very next phrase "23% discount off billed charges," Mr. Knackstedt testified that the term "billed charges" means something else because "[Great-West] would have had no way to apply those numbers to Kelsey's invoice." (Id.) According to Great-West, the definition of a contract term transforms like a chameleon to suit its environment.

Great-West also argues that the amendments did not require it to pay Kelsey any more money from December 31, 2000 forward unless the parties renegotiated a future fee agreement. **(**Ex. 37, Dep. of Chris Knackstedt at p. 91-92, 96.) Great-West acknowledges the contracts including the amendments do not expressly condition its obligation to pay Kelsey on the completion of these tasks. (Id. at p. 92 ¶¶4-7 and Ex. 38, Dep. of Chad Matteson at p. 178-79, 180-81.) However, Great-West takes the position that the amendment by itself was ineffective to increase payments to Kelsey. (Ex. 37, Dep. of Chris Knackstedt at p. 91.)

Mr. Knackstedt testified that from October 1, 2000 through the present, Great-West was only obligated to pay Kelsey at a 23% discount off Kelsey's rates for services established in 2000. (Ex. 37, Deposition of Chris Knackstedt at p. 95-96; *see also* Ex. 33, Correspondence from Robert M. Little, Great-West Life & Annuity's Insurance Company's Corporate Counsel, to Nicholas Ro, Kelsey's Corporate Counsel, dated August 30, 2006.) According to Mr. Knackstedt, Great-West was not obligated to pay the progressively lower discount rates unless and until Kelsey 1) renegotiated new payment terms on January 1, 2001 and each year thereafter, and 2) provided Great-West with its chargemaster. (Ex. 37, Deposition of Chris Knackstedt at p. 91-92, 96-97.) He also contended that the parties had not reached an agreement on what Kelsey would be paid in 2001 and 2002 and therefore, the terms of the amendments providing

---

[6] "In no event will Company pay more than the lower of the Fee Schedule or Provider's "usual billed charges."

decreasing discounts did not go into effect. (Ex. 37, Dep. of Chris Knackstedt at pp. 94-95.) Finally, Mr. Knackstedt contended that the discount rates the parties negotiated and memorialized in the amendments were only "to contemplate what the discount would be applied to the new Kelsey's ChargeMaster." (Id. at 91.) When asked to identify the contractual language supporting Great-West's interpretation on this issue, Mr. Knackstedt pointed to language stating "the fee schedule is attached and subject to amendment" and could identify no other contractual language to support Great-West's position. (Id. at 92.)

The phrase "the fee schedule is attached and subject to amendment" does not mean that Kelsey had to renegotiate with Great-West on January 1, 2001 and 2002 to get the benefit of increased payments. The fact that the parties could amend a fee schedule does not mean that they were required to do so or that they had to renegotiate a fee schedule before the previously agreed discount rates would apply. The meaning of the phrase upon which Great-West relies cannot be pushed, pulled or stretched to accommodate Great-West's interpretation.

Great-West's interpretation must also be rejected because it makes no sense when placed in the surrounding context of the negotiations. Kelsey and Great-West negotiated for months on a new compensation for their agreements. (Ex. 12-16) At the culmination of those negotiations, the parties signed the contract amendments with language discussing payments for the remainder of 2000, all of 2001, and all of 2002. (Id.) It defies belief that the parties spent five months negotiating a fee agreement only to have to sit down two months later, in December 2000, to start negotiating again.

Chad Matteson, the man who negotiated the amendments for Great-West, testified that Great-West's interpretation is incorrect. (Ex. 38, Dep. of Chad Matteson at pp. 178-181.) He testified that Kelsey was not required to take any action for the lower discounts to go into effect.

13

(Id.) Great-West was not expecting to renegotiate payment in January 1, 2001 or January 1, 2002 because "that had already been done." (Id. at p. 181) Mr. Matteson explained that the phrase "subject to amendment" did not have special significance when he drafted the amendment and that he had likely cut and pasted this language from the original exhibits to the HMO contract.[7] (Id. at p. 166.) Great-West's interpretation contradicts the clear and definite language of the contracts, requires the Court to ignore the terms of the parties' amendments and to rewrite the parties' agreements.

### D. Great-West is Required to Pay Kelsey at a 14% Discount Off its Billed Charges.

From the outset, Kelsey sought to be paid at a 12% discount off its billed charges for the PPO and POS products and a 14% discount off its billed charges for HMO products. (Ex. 5.) To ease the financial impact these new rates would allegedly have on Great-West, Kelsey agreed to phase in the 14% discount rate over 15 months. (Ex. 21-23.) As established by the negotiations over the amendments, the parties intended to modify the contract to the point where Kelsey would be paid at a 14% discount off its billed charges on an ongoing basis.

The contracts state that they will automatically renew as set out in Section 2:

> 2. <u>Term and Termination</u>. The initial term of this Agreement begins on the Effective Date of this Agreement and will continue in effect for a period of twelve (12) months. Thereafter, this Agreement will automatically be renewed for successive one (1) year terms until terminated as herein provided. . . .

Both parties agree that the contracts renew annually. (Ex. 2–4 at pp. KS 0008, KS 00049 and KS 00093 respectively; Ex. 36, Dep. of Marnie Matheny at p. 32; Ex. 37, Dep. of Chris Knackstedt at pp. 30-32.) The parties further agree that when the contracts renew the previous agreed

---

[7] Mr. Matteson testified that Exhibit III to the POS and PPO agreements did not include the "subject to amendment" language. (Ex. 38 at p. 166 ¶¶1-25) Had Mr. Matteson cut and pasted the first two sentences from either of these exhibits that phase would have in all probability been omitted. (*See* id.)

14

payment rates apply. (Ex. 36, Dep. of Marnie Matheny at pp. 79-80; Ex. 37, Dep. of Chris Knackstedt at pp. 30-32.) The language of the amendment also sets the last agreed rate of payment at a 14% discount off Kelsey's billed charges. (Ex. 21-23.) Because the last agreed upon rate continues when the contract renews, the 14% discount off billed charges continued after December 31, 2002 through today.

The deposition testimony of Messrs. Matteson and Knackstedt further supports this interpretation of the contracts. Mr. Matteson testified that from December 31, 2002 onward Kelsey was entitled to receive a 14% discount off of Kelsey's billed services.[8] (Ex. 38, Dep. of Chad Matteson at p. 201.) In addition, Mr. Knackstedt testified

> Q. Yeah. The terms of the contract regarding how Kelsey was going to get paid and what they were going to get paid renewed each year under the contract without either Great-West or Kelsey having to take any other action?
>
> [objection omitted]
>
> A. Yes.

(Ex. 37, Dep. Of Chris Knackstedt at p. 31-32.)

Section 4 of the contracts further supports Kelsey's interpretation on this issue. Section 4 addresses the process for renegotiating the compensation terms. (Ex. 2 at KS 00035 and Ex. 4 at KS 00115.) It states that if the parties do not agree to new compensation terms, then the "agreed upon compensation will become effective on the first day of the next term of this agreement." (Id.) Because the parties did not renegotiate Kelsey's compensation after the amendments were signed, Section 4 applies, and thus, the last remaining agreed upon compensation of 14% discount off billed charges became "effective on the first day of the next term of this agreement" and each term thereafter. (Id.)

---

[8] Mr. Matteson interpretation of "billed services" differs from Kelsey's interpretation of "billed charges."

Lastly, Great-West's conduct since this dispute arose bolsters Kelsey's interpretation that from December 31, 2002 onward, it is entitled to be paid a 14% discount off its billed charges. As discussed above, in May 2006, Great-West proposed that the parties enter into a Second Amendment to confirm a compensation rate of 14% discount off billed charges. (Ex. 31.) Great-West subsequently offered, in an effort to mitigate its damages, to reprocess Kelsey's invoices from January 1, 2006 onward at the 14% discount. (Ex. 39, Correspondence from Sean Gorman to Earnest Wotring dated June 2, 2007.) Neither action is consistent with the position Great-West has taken in this litigation.

The terms of how Kelsey was going to get paid renewed each year without further action by Great-West or Kelsey. After December 31, 2002, the 14% discount off billed charges continued to apply to the payments from Great-West to Kelsey under the terms of Section 2 and Section 4 of the parties' agreements.

### VII. CONCLUSION

For these reasons, Kelsey requests that the Court find as a matter of law that Great-West is contractually obligated to pay Kelsey:

- at a 23% discount off its billed charges from October 1, 2000 through December 31, 2000;
- at a 17% discount off its billed charges from January 1, 2001 through December 31, 2001; and
- at a 14% discount off its billed charges from January 1, 2002 through the present.

Kelsey also requests that the Court determine that "billed charges" means the amounts that Kelsey invoiced Great-West for providing medical services. Kelsey also seeks such other and further relief to which it is justly entitled.

Respectfully submitted,

**CONNELLY•BAKER•WOTRING LLP**

/s/ Earnest W. Wotring*
Earnest W. Wotring
State Bar No. 22012400
Southern District No. 15284
700 Louisiana, Suite 1850
Houston, Texas 77002
Telephone: (713) 980-1700
Facsimile: (713) 980-6925

**ATTORNEYS FOR PLAINTIFF
KELSEY-SEYBOLD MEDICAL GROUP, P.A., D/B/A
KELSEY-SEYBOLD CLINIC**

*Signed with permission by Allison J. Miller

OF COUNSEL:
Allison J. Miller
Texas State Bar No. 24043822
Southern District No. 560003
CONNELLY•BAKER•WOTRING LLP
700 Louisiana, Suite 1850
Houston, Texas 77002
Telephone: (713) 980-1700
Facsimile: (713) 980-6585

## **CERTIFICATE OF SERVICE**

  This is to certify that a true copy of the foregoing instrument was served electronically and by certified mail, return receipt requested on all attorneys of record on this the 22nd day of January 2008.

                /s/ Allison J. Miller
                Allison J. Miller