| UNITED STATES DISTRICT COURT | | SOUTHERN DISTRICT OF TEXAS |
|---|---|---|

Kelsey-Seybold Medical Group, PA, §
§
       Plaintiff, §
§
versus §     Civil Action H-07-640
§
Great-West Healthcare of Texas, Inc., §
§
       Defendant. §

## Opinion on Third Partial Judgment

1. *Introduction.*

A clinic sued a claims administrator to collect the amounts that it had been underpaid for service to its patients. The clinic has abjured collection from the patients' benefit plans, relying entirely on its direct claim against the administrator under the protocol between them for processing benefits. The administrator says that it is not liable because the clinic seeks recovery of benefits furnished solely through worker plans. It will prevail.

2. *Background.*

Kelsey-Seybold Medical Group, PA, is a large clinic with several locations in Houston. Great-West Healthcare of Texas, Inc., is a contract-claims administrator for insurers. These insurers are financial intermediaries to employee-benefit plans.

The 132,000 bills that the clinic is seeking to adjust total about $1,500,000 out of about $60,000,000 in total claims in the period. To manage the data, the parties agreed to a sample of 929 patient files to represent the population of all of the claims. Of these claims, 98.99% were against benefit plans. The claims cover four years – the limitation period for contract actions. The parties continued to do business together as this case progressed.

Plans are sponsored by employers. Employers, workers, or both fund the plan. Participants and their beneficiaries seek medical care. To get care, the participants must first assign their benefits under the plan to the clinic – Kelsey. The clinic sends its invoice to an agent of the plan to be reviewed and paid. The agent – Great-West – uses funds furnished by

the plan, usually through financial intermediaries like insurers, to discharge the plan's obligation to its participant by paying the clinic.

In September of 1996, Kelsey and Great-West entered three contracts. In September of 2000, they added a fee schedule. These arrangements increased the speed and predictability of payment and reduced the cost of billing and collecting for the clinic and the plans. The steps were to have been: (a) Kelsey treated a patient and recorded its "standard price" for the service rather than the fee it had negotiated with Great-West; (b) after accepting the patient's co-payment, it sought the balance from Great-West; and (c) Great-West paid a lower amount based on the fee in the schedule.

Kelsey says that it learned in 2006 that Great-West had not been paying under the schedule, deducting more than the agreed discount. In 2007, Kelsey sued Great-West – not the plans – to recover the difference under contract and regulatory theories. Its action rests on its contention that national preemption does not apply because (a) Great-West is independently obliged to pay and (b) Great-West is not an employee-benefit plan under federal law.

3.   *Independence.*

Kelsey and Great-West are nodes on a circle. Nothing about their relationship is independent.[1] Great-West is a second-level paperwork specialist for plans. Kelsey only holds a participant's claim against the plan by assignment.

Kelsey insists that the protocol for processing claims against Great-West's principals – the plans – is an independent obligation of Great-West to guarantee that it is paid. The agreements talk about Great-West paying claims, but its use of *pay* in context is equivalent to *disburse*. If a contract payroll service does not send your check, your claim for unpaid wages is against your employer.

If Great-West were late in paying under the Texas Insurance Code, it would be late in paying an obligation of a plan. A plan is requisite to the administration of a claim. Without the plans, Kelsey's assignments are empty. Without the plans, Kelsey would have no claim against Great-West because it never would have dealt with it except as a processor.

---

[1] An appendix on page six depicts the relationship.

4.  *Preemption.*

In 1974, the Employee Retirement and Income Security Act followed the principle of other arrangements to establish mechanisms and limits for an effective compensation policy. It parallels workers' compensation statutes and the Black Lung Settlement.[2] In short, the law says that a claim arising out of a plan may only be for the benefits in the plan. It preempts all other types of claims – state and federal, common law and regulation, tort and contract.

Kelsey's contract with Great-West directly relates to plans under the Act. Great-West was an agent of a disclosed principal; that principal worked for the plans in the interest of the participants collectively. Kelsey is seeking a benefit conferred on a worker by his participation in a plan.[3] How a plan finances its responsibilities is its business. When it chooses insurers, mutual funds, and contract-claims processors, it has not altered its status as the sole obligor for benefits.[4]

The national scheme does not immunize administrators from claims.[5] Regardless, because they are merely the agent of a disclosed principal, their liability is limited – liability rests with the principal. The scheme does not alter the common law's brutal efficiency, and it does not allow beneficiaries, or their assignees, to hold administrators – agents – individually liable for benefits due under a plan.

Kelsey says that the law only precludes claims about coverage, leaving disputes about the amount of the funds owed on a covered occasion for the general law's tangle of theories and damages. This is not what the statute says. Coverage versus quantification is a false distinction; every claim is for an amount of money determined by the facts of the medical service. Many

---

[2] 30 U.S.C. § 901; Starting with Wisconsin in 1911, all but a few states had workers' compensation laws by 1920.

[3] 29 U.S.C. § 1132(a)(1)(B) (who may sue and for what); Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523 (1981).

[4] If a person gives money to an agent to be paid to a third person, the third person does not thereby acquire an interest in the money itself; nor does he have a cause of action against the agent merely because the agent fails to perform his duty to the principal. Restatement (First) of Agency § 342 (1933); Brackenridge v. Claridge, 91 Tex. 527 (1898).

[5] 29 U.S.C. § 1132(d) (who may be sued).

ordinary tort suits are only about quantification; for instance, the defendant admits that it should not have backed its truck over the plaintiff, but it does not agree that he is permanently disabled.

Litigation about the quantity of a medical claim is just as destructive to the letter of the Act as is litigation over so-called entitlement. If plans and their administrators are burdened with the broad range of laws and regulations, employers will choose not to sponsor plans, paying higher wages to allow workers to insure themselves. Forty years ago, national policy in the Act selected the efficiency of plans over litigation.

A goal of the Act was to preclude litigation by supplying an administrative process. For that to be effective, the process could not be susceptible to state regulations and laws with the attendant expense and heterogeneity.[6] Allowing collateral suits against companies that work with plans would fund lawyers, injustice collectors, and court reporters – not sick children of workers. Processing agreements between doctors and administrators are meant to reduce transaction costs in processing claims. Efficient administration benefits the plans and doctors.

Because the suit is to recover benefits, 98.99% of which were promised under a federally regulated plan, Kelsey's Insurance-Code claims are preempted.

5.   *Plans.*

Because Great-West administers employer-sponsored health plans, those plans were the obligors. As a third-party administrator, Great-West has no liability for those claims. Great-West and Kelsey had a claims-processing arrangement, not a financial-liability arrangement.

Kelsey would not have served the beneficiaries without a plan. Each of the three agreements with Great-West say that the plan – or a payor designated by Great-West – is responsible for payment for the services rendered to beneficiaries. Great-West may have paid less than the amounts owed under the schedules, but it did so as an administrator for plans; they are ultimately responsible for payment. Neither side seems to have particularly adhered to their process, just casual inattention to the details.

---

[6] August 22, 1974, Senate: Floor debate on conference report on H.R. 2, *reprinted in* Subcommittee on Labor of the Committee on Labor and Public Welfare, 94th Cong., 3 Legislative History of the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, at 4770–4771 (1976).

6.      *Conclusion.*

As a claims administrator, Great-West Healthcare of Texas, Inc., has no liability under the contracts to pay Kelsey-Seybold Medical Group, PA. When it was underpaid, it should have sued the plans. Great-West is not an obligor on Kelsey's claims. It has no claim for Insurance-Code penalties because the Act forbids them.

What remains of this case is the essence of the dispute before it became rapacious – an accounting of performance under the protocol to establish a debt.

Kelsey-Seybold Medical Group, PA, will take nothing from Great-West Healthcare of Texas, Inc., by its claims under its alternatives to an action for the plan benefits adjusted by the processing agreement.

Signed on August 1, 2014, at Houston, Texas.

_____
Lynn N. Hughes
United States District Judge

## Kelsey-Seabold Medical Group, PA
### *versus*
## Great-West Healthcare of Texas, Inc.

